Your Honor, I would reserve five minutes. Could you be kind enough to bring the microphone closer? How's that, Your Honor? Better? Both of them, maybe? How's that? You can grab the other one and pull that one there, too. There you go. I have two. Oh, that's better. Right? I think only one might be okay. Okay. I've got to move back. Thank you, Your Honor. Ms. Zancone, Your Honors, may it please the Court, I'm asking for the following relief. That the certificate of extradition, in this case, be reversed, and that my client, Mr. Al-Nouri, be released from confinement. In this case, there are four issues. The first is probable cause. And that is whether the defendant has produced reasonably reliable probative evidence obliterating probable cause. There are two ways to do it. One is by compelling eyewitness statements. Specifically, that he did not commit the murders, at least the murder of the lieutenant. Counsel, your time is short. And I would very much appreciate your addressing the political offense doctrine. Very well, Your Honor. In that case, Your Honor, we know that there must be two components. An uprising is one. Second, acts incidental to the uprising. The focus here is not on the motivation for the acts, nor the types. It is, however, on the charges. So if we turn to the charges in this case, the ones produced by, I'll call it the Al-Khark investigative court. The Al-Khark court charged Mr. Al-Nouri with terrorist and disruptive activities under the act called the Terrorist and Disruptive Activities Act. So in essence, what he's been charged with is committing terrorism. That is the same, Your Honor, if we disregard the concept of terrorism as a political offense. So in other words, the fact that it's called terrorism doesn't negate it, even though the government's expert witness would say that the concept of terrorism negates the defense. I would disagree, and I'll get to that in a moment, Your Honor. The first component is uprising. This must be a revolt by indigenous people. This is according to Quinn, against their government or an occupying power. It suggests that the form or composition of the government is the struggle. It's a domestic struggle against the form or composition of the government, and revolt can only occur within the country in which the risers up live. So if we just pause for a moment and analyze that with respect to this case. These criteria for an uprising apply here. The killings here were aimed at police, local police. They were aimed to restore the Sunni influence in the national government. They were conducted wholly within Iraq. They were conducted by indigenous people, meaning residents, if you will, of Al Anbar province, and specifically Fallujah. The second component is an incidental component. It is, according to Quinn, a liberal standard. It is objective, nonjudgmental in its application. It is determinative by what the revolutionaries, not the courts, determined to be the tactics to bring down or change the government. Going back to my mention of the idea of terrorism, it in and of itself does not disqualify the defense. Here is murder equivalent to terrorism. One might look at it that way, but nonetheless the murders of these two individuals are done with the idea of overthrowing the local government. So, Mr. Eisenberg, if I could interrupt you for a moment. Yes, ma'am. There is evidence in the record that the local insurgents, the Sunnis, were opposed to the killing of the local police because many of those officers were Sunni. And also that the local movements were opposed to AQI and to their efforts in Iraq, which would seem to go to what you just said about the tactics being the choice of the insurgents. And it doesn't seem that these were their tactics, or at least there is some evidence that supports the conclusion that these were not their tactics. So these were not really political acts as part of the insurgency in 2006. I think, Your Honor, that conflates one group with another. In other words, what was going on in Iraq at this time was very decentralized. There were many groups, many groups who had their own individual construction, their own leadership, their own desires, their own objects. So if some disagreed with AQI, others perhaps did not. And in this case, I think it's wrong to label every revolutionary or reactionary in the country as being a member of the al-Qaeda in its international concept. But there was evidence and testimony that your client, Mr. al-Nouri, was in fact a member of AQI and taking direction from leaders in that organization who were not Iraqi. Your Honor, I respectfully disagree as to whether that was evidence. That was a conclusion done by the Al-Qaeda court. But I don't believe it relied on any specific evidence. What we did hear is someone who said that my client was a member of AQI. I submit, Your Honor, if that is even true, then it doesn't necessarily mean because he's a member of AQI he is part of an effort to commit terrorism that has no impact other than being part of the international caliphate. In other words, you can conduct yourself with aggressive action if what you want to do is get rid of, in this case, the influence of the newly installed government. And that is what the difficulty with this case is. It's hard to apply any conclusive decision with respect to the defense unless one is going to assume that simply because AQI is part of an international organization then that would make it very difficult to apply the defense in this case. I would admit that. But that's not what the evidence shows. The evidence doesn't show there's any connection to the international, I'll call it caliphate, if I'm pronouncing it correctly. None of these people ever went abroad to fight in Syria or some other country in which the concept of establishing the international caliphate was being espoused. All of these people were from Fallujah. All of these people lived in Fallujah almost their entire lives. There is no indication that anybody from the international part of Al-Qaeda met with these people. There's no indication that the international aspect of Al-Qaeda was present during either of these two murders. Doesn't the record include information that the local leadership, people who were giving direction, were not Iraqi? They were Al-Qaeda fighters from other countries. I think one was from Syria and the other, I'm forgetting the country of origin, but that there were people in Iraq who were leaders in AQI, who were directing Mr. al-Nuri, allegedly, who were not Iraqi. They were not local insurgents. I don't see that, Your Honor, from anything that I can tell from the people who were actually interviewed. So, in other words, you have the cooperator. You have eyewitness number one, eyewitness number two, eyewitness number three. Now, some people do say that there is a connection with AQI, but I don't see in the record from these people that there were actually members of the international caliphate organization sitting with them and planning. In fact, this particular, the murder of Officer Muhammad, I believe, occurred at a meeting in a house in Fallujah, where there were three or four men. None of them, I believe, were connected from outside of Fallujah. So does Mr. al-Nuri deny that he's a member of AQI? Because I thought I read that he was in a management position. Your Honor, Mr. al-Nuri denies that he was even part of this. As you can tell from part of the record that we have tried to produce, he maintains that he wasn't involved in any or either of these two shootings. So the answer to your question, Your Honor, is that he denies any kind of membership in AQI. In fact, other than the fact that someone has claimed that they were all part of that, I don't see that there's any way to confirm it. I thought I also read something about him receiving money, which in my mind was a bit of a contradiction. Either you're a member of a group or you're receiving money, but maybe you could be doing both. So is this just information that's coming from the Iraqi court? No, Your Honor. I'm sorry, I didn't mean to interrupt. No, it's not from the court. It is from one of the witnesses in this case who said at the end of one of the killings, 50,000 dinar were given to them. But we don't know from who, we don't know why, and we don't know what it was for. So that doesn't necessarily mean, doesn't mean at all, doesn't confirm at all, that the international aspect of this organization was involved in the planning or even the execution of the murders. If they were paid, if they're mercenaries, does that mean they're outside of the political action exception or political act exception? No, Your Honor, not necessarily. They could have been paid in order to develop ammunition, in order to somehow sustain themselves. It has nothing to do with being paid in order to commit terrorism. As far as I can see, and again, that's because the record is very thin and it doesn't reflect the reason for the payment at all. So respectfully, Your Honor, I would disagree with that conclusion. And I'm sure that, well, in order for any revolution to take place, there would have to be support. There would have to be support in terms of ammunition, in terms of weapons and so forth. So I see nothing in the file here that would indicate that it was simply done as a reward for killing people. So it could be money that was used by an international organization to finance efforts within Iraq? We don't know that, Your Honor. It's to speculate and therefore come away with speculation and say that the defense doesn't apply. What did the witness say was the source of the money, or did he? I don't believe he did. It just says they received 50,000 dinar at the conclusion of the event. So the incidental component, which is the second component, is according to case authority, something that should be applied objectively, nonjudgmentally, and that revolutionaries and not the court determine the tactics. And I don't know that there's much of a disagreement that the acts here happened in course of or connected with or in furtherance of the idea that there would be an uprising and that these acts were designed to bring it about. So what we don't consider are the following elements, and this is also in Quinn. Proof is not required of the potential or actual effectiveness. Motivation of the accused is not proof that is required. Actual membership in the group isn't required. There's a difficulty here for Mr. Alnori because he claims he wasn't a member of the group, but people are pointing the finger at him, so he must defend himself, and he's using the political defense as one of his four defenses. Political motivation is also not to be considered, nor is the group's organization or hierarchy. That all comes from Quinn. So if all that is true, it's not a matter of making sure that the activities fit within a very narrow peg or hole in order for the defense to apply. We just don't have enough here to say that it doesn't apply. Now I know he has the obligation of showing that the defense is a defense that is appropriate in his particular case, and I say he's made that claim just because there isn't any indication otherwise that this is part of an international terroristic activity undertaken by him. So to further the idea about what has happened here, the killings of these two policemen were not done for personal reasons. As I mentioned, they were done by local Fallujah residents. They were done within Iraq. There's no proof, and this goes to a previous question perhaps by Judge Graber, that al-Qaeda organized, directed, supported, or otherwise carried out these killings. And to my knowledge from the record, no one was president from al-Qaeda, the international al-Qaeda, at any of these meetings. There's no records to indicate that al-Qaeda directed the killings. So the government would say that the defense would not apply because it doesn't include international political coercion. Again, there's no record to show that these individuals were supported by al-Qaeda. Mr. Eisenberg, I found the reference I was trying to recall, that the AQI leader of the Anbar province where Fallujah is located was Jarar al-Shami, a Syrian foreign fighter. So there are specific people named in the record who were not Iraqi, who were the leaders of AQI in their efforts there. And what I understood your previous answer to be was there was no evidence of that. Well, then I stand corrected, Your Honor. But I don't believe there's any evidence that any of those people were involved with these meetings. Just simply that they were in killings, just simply that they were present, doesn't necessarily mean the defense doesn't apply. I think you have to look at what we have in terms of the actual activities, who did them, who was present, and how were they planned. And to say that AQI was present in the area doesn't get you to the point where you can say the defense does not apply. So you wanted to reserve some time. You're at two and a half minutes. Did you still wish to do so? No. I have two and a half minutes of my own time. All right. Well, then let me go to one of the other. You have two and a half minutes left. You wanted to reserve time for rebuttal. If you use that two and a half minutes, then you in theory would not have any rebuttal time unless I decided that you could have some rebuttal time. And I'm pretty generous, so. I thank you, Your Honor, but I'm going to take those two minutes now. Okay. May it please the Court. I want to turn to the idea that torture and abusive treatment doesn't apply here. This is my client's third defense. Professor Hamoudi, the relator's expert, was able to lay out a good deal of information concerning how the criminal justice system works in Iraq. In effect, there are trials that have no meaning. They are swift. They take up perhaps one day. The verdict is rendered almost immediately. And typically in cases like this, the sentence is death. The results of the cases heavily rely on confessions, often forced and are particularly prevalent in courts trying terrorism cases. There are three examples that I can see. I'll just cite one of them in terms of how this process works. There was the evidence of confession that the accused tried to recant in court because of torture. The court dismissed the claims and sentenced 24 men in this particular case to death in a case that lasted one day. The government says the rule of non-inquiry would apply here. I disagree, Your Honor, respectfully. There are several cases that recognize the idea behind torture and behind forced confessions. And even in the Ninth Circuit, Imani recognizes the possibility. In this particular case, the defense would apply because the Iraq system of justice simply does not recognize any standard that we would be comfortable with. And finally, the last one is investigation of other offenses. Your Honor, I will simply say that Iraq does intend to investigate my client. The case summary for other offenses, the case summary indicates that extradition is for these two incidences only. But as far as other cases for which the accused is wanted, that's in the case summary, these cases are still under investigation. No legal proceedings have been taken as yet against him, as yet against him. It implies to me, Your Honor, that that surely is to happen. I know we don't want to speculate, but frankly, I don't come away with any other conclusion. If that's true, then according to the treaty between the two countries, which provides that no person shall be tried for any crime other than that for which he was surrendered without the consent of the surrendering-eyed party, would have to apply. However, Mr. al-Nuri, at that point, would be in the custody of Iraq. Is Iraq prepared to say, we'll send him back so that he can enjoy to the United States, so that he can enjoy his rights under the habeas corpus statute, which allows him to come to court and make a case? I respectfully submit, Your Honor, I doubt that that would happen. And would the government consent to have him tried and investigated without him coming back and enjoying his rights here? I hope that that would not happen, because that would deprive him of the due process of being able to take advantage of the statute. Your Honor, I thank you for the additional time, Your Honor. Thank you. Good morning, Your Honors. May I please the court? My name is Jillian Besanson. I represent the government respondents. Three courts have carefully considered the petitioner's case, and all three got it right. The petitioner is extraditable to Iraq, to allow that country to prosecute him for the two executions of police officers that he committed on behalf of al-Qaeda in Iraq. Counsel, I'm going to ask you also to concentrate on the political offense exception. And I want to take you through a series of hypotheticals to help me understand exactly what your position is. And so I want you to suppose that there is clearly an uprising in Country X. There's no question about that aspect of it. And the accused person lives in Country X, has never lived anywhere else, and commits two killings in order to support the uprising. The political offense exception would apply in that situation. So now I want to change the facts and ask for your position on that. Suppose that within the group that is part of this uprising, there are differences of opinion about tactics. There are some people, again, all local in this example, who really don't want anybody killed. And yet there's a group who think that violence is the answer. Does the fact that some people within the uprising disagree with what the individual did, does that make it somehow not incidental to the uprising or for any other reason not part of a political exception? No, Your Honor. I think that really as is illustrated by this case, outside of the AQI context, that there can be multiple parts of an uprising and different tactics that are used in an insurgency. So what's important is the fact that that aspect of the insurgency is trying to change its own internal political structure. I don't think there has to be a… So now let's assume that a group from another country says, boy, what you're doing is really justified. We're going to come over and we're going to also help out. But our person is still local and is just doing what the person is doing. Does the presence of outsiders destroy the ability to rely on the political offense exception? I think there's a possibility it could. Why? And in what circumstances? If, for instance, one foreign fighter came to assist a domestic political uprising that was an uprising by the indigenous people to challenge that local government, that wouldn't defeat the political offense exception. And so why would it matter if there are 100 locals and 25 people from a neighboring country who are sympathetic, but our person is still a local person? Why does the number matter? I could imagine a time when there would be so many foreign fighters coming in that it's no longer a local insurgency, because under Quinn the uprising has to be the people of that country rising up. So if we reach some point, some undefined point, where it's no longer made up of the people rising up against their own government, but it's foreigners coming in to try to influence the government, the exception would not apply. Certainly Quinn and the other cases actually deal with people who aren't local to the place. So they don't really, to my mind, answer this question. So different tactics for different parts don't matter. Some participation elsewhere. And I guess the next question I have, and then I'll let you go into what other things you want to say, is in addition to different tactics, suppose that different threads of this uprising have different ultimate goals. The part that our hypothetical individual is in wants to overthrow the government and put in different people that they like better, and it's basically a typical uprising. There are some other people who say, well, we want anarchism, or we want to annex to another country, but that isn't the way that this person feels. Does that make the extraditable person unable to rely on political offense? I think we would need more information about whether the goals of both of those threads are still local goals, and also whether the act then was related to that specific local goal. Under Quinn, though, there is a geographical component. So if there were actions taken to annex another area. Everybody is from Fallujah here. The person you're trying to extradite is from Iraq, and these events happened in his hometown. So we don't have someone coming from Italy to do something or from Syria to do something. He is local, correct? The AQI organization. Is he local? That's the question I'm asking. Yes, he is. OK, so he meets the criteria if the uprising is local and what he's doing is intended to further that. So really the question, it seems to me, is what you're getting at is whether the uprising is actually a local uprising. The government argues both points that the uprising is not a domestic uprising because AQI is not a domestic organization and that the act of killing police officers is not in furtherance or incidental to the local insurgency. I'd like to talk about some fundamental principles before I get into the prongs. First, Quinn stands for the proposition that the political offense exception does not protect international terrorism. It does not protect exportation of political violence. It also establishes that it's the petitioner's burden to show that the political offense exception applies. And I think I heard Mr. Eisenberg say today there's no evidence that the exception does not apply. That is not the standard. The petitioner is required to establish the essential elements of both of those prongs before the burden shifts to the government to show otherwise. I think there's also a disagreement here about what is the scope and the context of what the court should be looking at. Because the petitioner urges the court to zoom in on really local, that this crime happened in Fallujah, involved local residents. Although I'm not sure how much information is really in the record besides that the petitioner is a local resident. And I think that that position is contrary to Quinn. Especially with regard to the second prong of Quinn. Quinn says that the courts have been willing to examine all of the circumstances surrounding the commission of the crime. And that in determining whether an act is causally or ideologically related, the courts can look to membership in an uprising group, similarity to other acts committed by the group, and the degree of control by a hierarchy within the group. So all this is inconsistent with a position that the court should limit its inquiry to this particular offense by this particular petitioner. And with that, Your Honor, the petitioner has not met his burden to show that either prong of the exception is met here. AQI was not part of a domestic political insurgency. The extradition court's factual findings on this point are supported by the testimony and the expert report of Professor Whiteside. Those are subject to clear error review and the extradition court did not clearly err. According to Professor Whiteside and adopted by the extradition court, AQI was an official Al Qaeda franchise. It was not a group of indigenous Iraqis. It originally had a Jordanian leader. It was ejected from Afghanistan before moving into northern Iraq before becoming an Al Qaeda franchise. It never had indigenous Iraqi leadership. After the death of the Jordanian leader, the next leader of the group was Egyptian. The leader of the province where Fallujah is located at the time of these crimes was a Syrian foreign fighter. And Judge Beatty referred to the point in the record where Professor Whiteside indicated that at the time these crimes occurred, that all the emirs in Fallujah would have been following the instructions and the directives of that local leader who was a Syrian foreign fighter and not an Iraqi. This international leadership is consistent with AQI's international presence and international leadership. And because of that, it had a global agenda. Professor Whiteside's testimony and report indicated that AQI was responsive to higher level leaders in Pakistan and that during this period, the local AQI emirs in Fallujah worked under the Syrian leader and followed his instructions. Leading up to this time period, AQI conducted violent acts not only in Iraq, but in other places, including Jordan, Israel, and Turkey. The goal was not to change the composition of the Iraqi government, but to take over the Iraqi lands as part of its mission to establish a transnational caliphate in the Levant region. Sort of getting back to Judge Graber's hypothetical, Professor Whiteside also noted evidence that in this one year period between August 2006 and August 2007, there was evidence that 700 foreign fighters had come into Iraq on behalf of AQI to participate in the violence, which is another indication that this is not a domestic uprising. As I mentioned, Quinn discussed that an uprising is indigenous people rising up against their own government. And that's not what AQI was doing. The group was capitalizing on turmoil in Iraq to further its own mission. It was not working. Would it be fair to say that the incident test in Quinn is met because there is that Sunni insurgency or disturbance in 2006, but that the real issue is whether or not there's a difference between the offense that El Mory is charged with and that 2006 Sunni insurgence? In the government's view, there is no domestic insurgency within Quinn because we're referring only to AQI. There was a larger Sunni insurgency at the time. AQI wasn't part of that. But moving on to the second prong, Professor Whiteside also opined that this tactic of targeting police officers made AQI an outlier group within all the different Sunni insurgency groups. And at some point, the other Sunni insurgency groups actually became an armed conflict with AQI because of this practice of targeting police officers, which was not welcomed by the other insurgent groups. And Mr. Eisenberg indicated that the second prong was not may not be disputed here, but the government does heavily dispute the second prong because AQI was not a domestic political uprising. Its goals were international goals, and it was attacking police officers who were conducting regular law enforcement activities. The petitioner has not met his burden to show that these killings of police officers were incidental to the Sunni insurgency outside of AQI. I'd like to briefly address the concern about the personal monetary gain. There is evidence in the record that the petitioner received some level of payment after one of these murders. In the report and recommendation in the underlying habeas matter, the magistrate judge relied on that in finding that the political offense exception did not apply. That is another basis that does not apply, although certainly we don't have any information, as Mr. Eisenberg indicated, about what specifically that payment was for. I'd also briefly just like to address the third and fourth issues, the rule of non-inquiry, as well as the speculation that the petitioner may face additional charges once he's in Iraq. Both of these concerns are issues that are left for the Secretary of State. No court, no federal court, has ever created an exception to the rule of non-inquiry to allow an exception to extradition based on humanitarian concerns. In fact, the Supreme Court in Munaf V. Garan dealt with this issue as it related to Iraq. In that case, there were two U.S. citizens who were held in Iraq by the U.S. military for crimes committed there, and they brought a habeas petition to challenge their transfer to Iraqi authorities and, as part of that, expressed concern that they would be tortured. The court, of course, expressed concern that that may happen, but said that that was a consideration that was left to the political branches and not to the courts, because the political branches, in particular here the Secretary of State, have leverages and can get diplomatic assurances that the courts are unable to. So the government would ask this court not to create this exception for the first time ever in this case, especially given that the Supreme Court has already addressed this issue in relation to Iraq. And finally, the issue about whether the petitioner may be charged with additional offenses. In all of the years since this extradition request was submitted, Iraq has not ever submitted any follow-up request, and certainly speculation that the petitioner may face further charges in the future cannot prevent his extradition on the crimes for which he is already charged. If there were to be some future violation of the treaty, the State Department would address that. And unless the court has any further questions, the government would ask the court to pass the baton to the Secretary of State, allow the Secretary to continue the extradition process, and affirm the denial of the habeas petition. Thank you. Thank you. Mr. Eisenberg, you said you didn't want rebuttable. I'll give you one last chance. Would you like a couple of minutes? I will remark this with respect to what was just said about leaving it up to the Secretary of the State to determine whether extradition should occur. It sounds like it's going to be a foregone conclusion. I don't know that there's going to be any guarantee that the State Department in this case at this time will be able to consider this case and determine on the grounds that I'm prepared to argue to the State Department there should be no extradition. And that is because the State Department currently has evidenced its position on whether it's going to allow people to be extradited or turned over to another country. And that is what I see that happened currently with respect to the extradition, or I guess I'll call it the extradition, of the detainees who had been recently arrested. They were extradited, if you will, to El Salvador. And that was in March of this year where the Secretary of State approved the transfer of the detainees to El Salvador and in fact applauded the idea that El Salvador was willing to take these people who had been not convicted of anything. There was a public thanks issued by the Secretary of State to the Salvadorian President stating that housing inmates in El Salvador saved the United States taxpayers money. So I have less confidence, Your Honor, that my client, if Your Honors are going to determine that this case should go forward, he's going to get a fair shot in the State Department. That is a concern that, obviously, that I have. And the other matter that I would like to indicate and respond to is that it's not just a case of whether Iraq hasn't determined whether it intends to investigate my client for other crimes. It claims that he's under investigation for other offenses. And as I read to you a moment ago, under their position with respect to what they intend to do, they will be investigating him without any doubt. Your Honor, I think that's just the way the process is going to work. And I have less confidence than my colleague that he's going to be given the rights of coming back to a court to determine whether habeas corpus is going to be available to him. It just won't be. Thank you, Your Honor. Thank you. Counsel, thank you both for your arguments this morning. They were very helpful. Ms. Besantzen, thank you for being here during the shutdown. This case is submitted, and we are adjourned.
judges: GRABER, BADE, Navarro